IN THE SUPREME COURT OF NORTH CAROLINA

No. 452A19

Filed 20 November 2020

IN THE MATTER OF: A.J.P.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 26 July 2019 by Judge Hal G. Harrison in District Court, Madison County. This matter was calendared for argument in the Supreme Court on 7 October 2020 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

> *Law Offices of Jamie A. Stokes, PLLC, by Jamie A. Stokes, for petitioner-appellee Madison County Department of Social Services.*
>
> *Cranfill Sumner & Hartzog LLP, by Laura E. Dean, for appellee Guardian ad Litem.*
>
> *Wendy C. Sotolongo, Parent Defender, by J. Lee Gilliam, Assistant Parent Defender, for respondent-appellant father.*

NEWBY, Justice.

Respondent-father appeals from the trial court's order terminating his parental rights in the minor child A.J.P. (Ava).[1] On appeal respondent-father argues (1) that the trial court abused its discretion by denying his motion to continue the termination hearing; (2) that some findings of fact are not supported by clear, cogent,

---

[1] A pseudonym is used to protect the identity of the juvenile and for ease of reading.

and convincing evidence and that the remaining findings are insufficient to support the trial court's conclusions of law; (3) that sufficient grounds did not exist to terminate his parental rights for having willfully left Ava in foster care or placement outside the home for more than twelve months without making reasonable progress under the circumstances to correct the conditions that led to her removal, *see* N.C.G.S. § 7B-1111(a)(2) (2019); and (4) that sufficient grounds did not exist to conclude he had willfully abandoned Ava, *see* N.C.G.S. § 7B-1111(a)(7). After careful review, we affirm.

Ava was born in July 2016. On 13 July 2016, the Madison County Department of Social Services (DSS) obtained nonsecure custody of Ava and filed a juvenile petition alleging that Ava was a neglected and dependent juvenile. The juvenile petition alleged that Ava was born "possibly premature" with a low birth weight and was admitted into the neonatal intensive care unit (NICU). Ava's meconium tested positive for cocaine, benzodiazepines, and clonazepam. Ava's mother had received no prenatal care and tested positive for cocaine and benzodiazepines. Ava's mother was on probation for a felony possession of cocaine conviction. The putative father, who was Ava's mother's boyfriend at the time, was on probation for a felony hit-and-run conviction. The juvenile petition further alleged that Ava's mother and putative father were unable to care for Ava and lacked an appropriate alternative child care arrangement.

The trial court held a hearing on the juvenile petition on 8 August 2016 and later entered an order adjudicating Ava to be a dependent juvenile. The trial court set the permanent plan to reunification with a concurrent plan of adoption. Following a hearing held on 12 October 2016, the trial court entered a disposition order on 14 November 2016. The trial court adopted the developed and signed case plan for Ava's mother and the putative father but found that they had made minimal efforts on the case plan. Ava remained in DSS custody.

After a hearing on 6 April 2017, the trial court entered a permanency planning order on 4 May 2017 that changed the permanent plan to adoption, with a secondary plan of guardianship. On 6 April 2017, Ava's mother relinquished her parental rights to Ava. Following a hearing on 13 July 2017, the trial court entered a permanency planning order on 23 October 2017. The trial court found that the putative father had indicated he was willing to relinquish his parental rights to Ava but had failed to maintain contact with DSS. The trial court ordered DSS to proceed with filing a petition to terminate the putative father's parental rights if a relinquishment was not received. On 25 July 2017, the putative father relinquished his parental rights to Ava; however, as later discovered, he is not the biological father.

After a hearing on 27 October 2017, the trial court entered a permanency planning order on 13 November 2017 ordering DSS to proceed with filing a motion to terminate the parental rights of any unknown fathers, and DSS did so on 18 January 2018. DSS alleged that any unknown fathers had willfully left Ava in foster care or

placement outside the home for more than twelve months without making reasonable progress under the circumstances to correct the conditions that led to her removal, *see* N.C.G.S. § 7B-1111(a)(2), and had willfully abandoned Ava, *see* N.C.G.S. § 7B-1111(a)(7).

Ava was born in July 2016. A year and three months later, respondent-father was incarcerated on 9 October 2017 on convictions for possession of a firearm by a felon and felony possession of cocaine with a projected release date of 20 September 2019. Two months after DSS filed its motion, in March of 2018, respondent-father contacted DSS to indicate that he might be Ava's biological father. In May 2018, a paternity test confirmed that respondent-father was Ava's biological father.

On 13 June 2018, the trial court ordered DSS to facilitate a home study on two individuals as possible placement providers for Ava. DSS made reasonable efforts to secure a relative placement on behalf of respondent-father, but could not do so. On 2 August 2018, DSS sent an out-of-home family services agreement to respondent-father. The agreement required him to (1) complete a mental health assessment and substance use assessment and follow recommendations; (2) complete a domestic violence evaluation; (3) not incur new legal charges; (4) keep DSS informed of the outcomes of pending and future charges; (5) follow recommendations of probation and parole; (6) keep $25.00 in his possession at all times to pay for random urinary drug screens for six months; (7) remain substance free; (8) keep DSS informed of all prescribed medications; (9) obtain and maintain employment and show financial

ability to meet Ava's basic needs for six months; (10) obtain and maintain housing for six months; (11) attend Child and Family Team meetings and permanency planning meetings, as well as cooperate with DSS; (12) be respectful to DSS staff; (13) keep DSS informed of any changes of address and/or phone number; (14) complete parenting classes; and (15) follow and adhere to the visitation plan. Six weeks later, respondent-father signed the agreement on 24 September 2018 and returned it.

On 24 September 2018, Ava's mother and respondent-father testified in a hearing, and the trial court entered a permanency planning order on 31 October 2018. In its findings, the trial court described Ava's mother's testimony that she and respondent-father had a sexual relationship which resulted in her pregnancy. Their relationship involved the use of controlled substances, and respondent-father was the supplier of her controlled substances. Ava's mother testified that she had a conversation with respondent-father in March 2016 when she learned she was pregnant and that respondent-father knew she was pregnant. Respondent-father continued to supply her with controlled substances during her pregnancy. In addition, Ava's mother testified that she contacted respondent-father from the hospital when Ava was born and that respondent-father bought Ava gifts from time to time but did not provide child support. Respondent-father, on the other hand, testified that he had no knowledge of Ava's birth until September 2017, after a conversation with Ava's mother. Six months later, in March of 2018, he contacted DSS regarding Ava, who was almost two years old by that time.

In a later proceeding on 1 July 2019, the trial court clarified by an oral finding of fact that, among other things, respondent-father knew of the child during the pregnancy, thereby finding the mother's testimony credible. In the 31 October 2018 order, the trial court relieved DSS of further reasonable efforts to reunify Ava with respondent-father, concluded that the permanent plan remained adoption, and ordered DSS to file a motion to terminate respondent-father's parental rights.

On 31 October 2018, the same day the order was filed, DSS filed a motion to terminate respondent-father's parental rights. The termination hearing was continued on 17 December 2018, 16 January 2019, and 21 February 2019. On 4 April 2019, DSS filed a petition to terminate respondent-father's parental rights. DSS alleged that respondent-father had willfully left Ava in foster care or placement outside the home for more than twelve months without making reasonable progress to correct the conditions that led to her removal, *see* N.C.G.S. § 7B-1111(a)(2), and willfully abandoned Ava, *see* N.C.G.S. § 7B-1111(a)(7). That same day, the termination hearing was continued to 16 May 2019.

On 16 May 2019, counsel for respondent-father withdrew from representing respondent-father due to a conflict of interest, and a new attorney was appointed to represent respondent-father. The trial court continued the termination hearing again until 1 July 2019 to allow the new attorney to prepare for the hearing.

On 1 July 2019, the trial court held a hearing on the petition to terminate respondent-father's parental rights. At the beginning of the termination hearing,

respondent-father's attorney requested a continuance, indicating that he needed more time to review the permanency planning order filed on 31 October 2018 because it was not included in the court file that he copied at the time of his appointment. The trial court denied his motion to continue.

During the 1 July 2019 termination hearing, the trial court orally made substantive findings, stating that by the standard of clear, cogent, and convincing evidence

> the respondent is the biological father of this juvenile; that the biological mother informed him of her pregnancy back in March of 2016, approximately four months prior to the child's birth. Thereafter and for the next fifteen months, respondent father did nothing to pursue his rights as the biological father of this child; there was little or no contact. Attempts by the father to find an appropriate (inaudible) person failed because of his family's inability to let that happen.
>
> The one credit we learned for the respondent was presented through testimony of the DART [substance abuse] program, which he never signed and did not pursue any action to comply with that case plan except for the completion of a parenting class called Fatherhood Accountability in prison.
>
> [Respondent] testified as to other actions he could have (inaudible) classes, but offered no supporting documentation to support (inaudible) through that testimony.
>
> The Court further finds that at no time during or since the birth of this child has the . . . respondent contacted or tried to contact this child and to (inaudible). The respondent was here in August the child (inaudible) and acknowledged (inaudible) the Department's effort to

terminate his parental rights, elected not to send cards, not to make calls. In addition, the respondent has been in this courtroom on (inaudible), during which time he never once requested the opportunity to see this child.

Therefore, at this time the Court will conclude as to ground one that the respondent has failed to make reasonable progress toward complying (inaudible) and, further, that the respondent has abandoned the child (inaudible).

All right. We will proceed with disposition.

On 26 July 2019, the trial court entered a written order concluding that both grounds alleged in the petition existed to terminate respondent-father's parental rights, that the respondent-father had willfully left Ava in foster care or placement outside the home for more than twelve months without making reasonable progress and had willfully abandoned Ava. To support its conclusion, the trial court reiterated its oral findings, including that "the respondent father was aware the . . . mother was pregnant" before Ava's birth in July 2016 even though "the respondent father . . . testified he did not know of the existence of the juvenile until shortly before he was incarcerated" in October 2017. The trial court found "that the . . . mother and father had an ongoing relationship prior to the birth of the juvenile that involved the use of controlled substances"; "that at no time from the birth of the juvenile in July 2016 (the same month the juvenile came into DSS custody) did the respondent father contact DSS to inquire as to the juvenile until March 2018, approximately 20 months after the juvenile came into DSS custody; [and] that the respondent father did not

contact [DSS] prior to his incarceration before October 2017." The trial court also determined that it was in Ava's best interests that respondent-father's parental rights be terminated, and the trial court terminated his parental rights. *See* N.C.G.S. § 7B-1110(a) (2019). Respondent-father appeals.

I.

First, respondent-father argues that the trial court erred by denying his motion to continue the termination hearing in order to allow his counsel to review the permanency planning order filed 31 October 2018. We disagree.

Respondent-father's counsel made an oral motion to continue the termination hearing when it commenced on 1 July 2019 and advised the trial court that he needed "more time for preparation." He explained that although he had copied the court file at the time of his appointment on 16 May 2019, the court file did not contain a copy of the 31 October 2018 order, and he "was not aware" of the existence of the order at that time. Counsel claimed he did not become aware of the order until he "received a copy of the DSS Court Report . . . June 28th, which made reference to that hearing and order." Counsel for DSS opposed the motion to continue, stating that he had provided a copy of the order to respondent-father's counsel as a potential exhibit and had not received a discovery request from him. The trial court denied respondent-father's motion.

Section 7B-803 of the North Carolina General Statutes provides the following:

> The court may, for good cause, continue the hearing for as long as is reasonably required to receive additional evidence, reports, or assessments that the court has requested, or other information needed in the best interests of the juvenile and to allow for a reasonable time for the parties to conduct expeditious discovery. Otherwise, continuances shall be granted only in extraordinary circumstances when necessary for the proper administration of justice or in the best interests of the juvenile.

N.C.G.S. § 7B-803 (2019). Additionally, N.C.G.S. § 7B-1109(d) provides that "[c]ontinuances that extend beyond 90 days after the initial petition shall be granted only in extraordinary circumstances when necessary for the proper administration of justice." N.C.G.S. § 7B-1109(d) (2019).

Respondent-father did not assert in the trial court that a continuance was necessary to protect a constitutional right. *See In re A.L.S.*, 374 N.C. 515, 517, 843 S.E.2d 89, 91 (2020) (A motion based on a constitutional right presents a question of law, and the order of the court is reviewable.). Thus, we review the trial court's denial of his motion to continue for abuse of discretion. "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988).

Here the petition to terminate respondent-father's parental rights was filed on 4 April 2019, and the termination hearing was scheduled for 16 May 2019 in District Court, Madison County. On 16 May 2019, respondent-father's counsel withdrew due

to a conflict of interest, respondent-father was appointed new counsel, and the trial court continued the matter until 1 July 2019, more than six weeks later, "to allow [the new] attorney to prepare for the termination hearing." Any further continuance of the 1 July 2019 termination hearing, which was held eighty-eight days after the filing of the petition for termination, would have pushed the hearing beyond the 90-day period set forth in N.C.G.S. § 7B-1109(d). Thus, respondent-father was required to make a showing that extraordinary circumstances existed to warrant another continuance. *See* N.C.G.S. § 7B-1109(d).

Respondent-father, however, made no showing that extraordinary circumstances existed to require another continuance of the termination hearing, and we conclude that the trial court did not abuse its discretion by denying respondent-father's motion to continue. Although respondent-father's counsel argued that he was not aware of the order at issue until a few days prior to the termination hearing, there were numerous references to the 24 September 2018 permanency planning hearing and the resulting 31 October 2018 order in the court file. Significantly, five DSS court reports discuss the 24 September 2018 permanency planning hearing, provide that Ava's mother testified at that hearing, and summarize the findings of the resulting permanency planning order. The DSS court reports summarize key portions of the 31 October 2018 order such as Ava's mother's testimony that respondent-father knew she was pregnant and that she informed him that he was possibly the father of the child before Ava's birth and repeatedly after her birth.

Here the court file that counsel had access to and copied on 16 May 2019, a month and a half before the termination hearing, contained multiple references to the 31 October 2018 order following the 24 September 2018 permanency planning hearing and summarized the evidence presented at the hearing and some of the trial court's findings. We cannot say that the trial court abused its discretion by denying the motion to continue.

II.

Next, respondent-father contends the trial court erred by adjudicating grounds for the termination of his parental rights based on willful failure to make reasonable progress to correct the conditions that led to Ava's removal and willful abandonment. *See* N.C.G.S. § 7B-1111(a)(2), (7). Specifcally, respondent-father challenges several of the trial court's findings of fact as not being supported by clear, cogent, and convincing evidence and argues that the findings of fact are insufficient to support the trial court's conclusions of law. Those findings of fact which he does not challenge are deemed to be supported by competent evidence and are binding on appeal. *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991).

Our Juvenile Code provides for a two-step process for the termination of parental rights: an adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-1109, -1110 (2019). The petitioner bears the burden at the adjudicatory stage of proving by "clear, cogent, and convincing evidence" that one or more grounds for termination exist under subsection 7B-1111(a) of the North Carolina General Statutes.

N.C.G.S. § 7B-1109(f). "We review a trial court's adjudication under N.C.G.S. § 7B-1109 'to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law.' The trial court's conclusions of law are reviewable de novo on appeal." *In re C.B.C.*, 373 N.C. 16, 19, 832 S.E.2d 692, 695 (2019) (quoting *In re Montgomery*, 311 N.C. 101, 111, 316 S.E.2d 246, 253 (1984)). If the trial court adjudicates one or more grounds for termination, "the court proceeds to the dispositional stage, at which the court must consider whether it is in the best interests of the juvenile to terminate parental rights." *In re D.L.W.*, 368 N.C. 835, 842, 788 S.E.2d 162, 167 (2016) (citing *In re Young*, 346 N.C. 244, 247, 485 S.E.2d 612, 614–15 (1997); then citing N.C.G.S. § 7B-1110 (2015)).

Termination under N.C.G.S. § 7B-1111(a)(2)

> requires the trial court to perform a two-step analysis where it must determine by clear, cogent, and convincing evidence whether (1) a child has been willfully left by the parent in foster care or placement outside the home for over twelve months, and (2) the parent has not made reasonable progress under the circumstances to correct the conditions which led to the removal of the child.

*In re Z.A.M.*, 374 N.C. 88, 95, 839 S.E.2d 792, 797 (2020). Leaving a child in foster care or placement outside the home is willful when a parent has "the ability to show reasonable progress, but [is] unwilling to make the effort." *In re Fletcher*, 148 N.C. App. 228, 235, 558 S.E.2d 498, 502 (2002).

Moreover, this Court has held that

parental compliance with a judicially adopted case plan is relevant in determining whether grounds for termination exist pursuant to N.C.G.S. § 7B-1111(a)(2) even when there is no direct and immediate relationship between the conditions addressed in the case plan and the circumstances that led to the initial governmental intervention into the family's life, as long as the objectives sought to be achieved by the case plan provision in question address issues that contributed to causing the problematic circumstances that led to the juvenile's removal from the parental home.

*In re B.O.A.*, 372 N.C. 372, 384, 831 S.E.2d 305, 313–14 (2019). For a respondent's

noncompliance with a case plan to support termination of his or her parental rights,

there must be a "nexus between the components of the court-approved case plan with

which [the respondent] failed to comply and the 'conditions which led to [the child's]

removal' from the parental home." *Id.* at 385, 831 S.E.2d at 314.

In its written termination order filed 26 July 2019, the trial court found facts

regarding the grounds under N.C.G.S. § 7B-1111(a)(2) in finding of fact 11, which

spans a page and a half of the five-page order. The trial court found that Ava tested

positive for controlled substances at birth, received treatment in the NICU, and was

placed in DSS custody when she was eleven days old. By the time of the order, she

had been in DSS custody for nearly three years. Ava had been removed from the home

of her mother and her mother's boyfriend, partly as the result of their substance

abuse issues. The trial court further found that respondent-father and the mother

had an ongoing relationship before Ava's birth that involved the use of controlled substances, and respondent-father was aware the mother was pregnant.[2]

Over a year after Ava's birth in July 2016, respondent-father was incarcerated in October 2017 and, five months after that, contacted DSS in March 2018 to inquire about Ava. In its oral findings at the adjudicatory stage, the trial court found

> that at no time during or since the birth of this child has the . . . respondent contacted or tried to contact this child . . . . [He] elected not to send cards, not to make calls. In addition, the respondent has been in this courtroom on (inaudible), during which time he never once requested the opportunity to see this child.

In its written findings, the trial court found that respondent-father had not developed a case plan and had not complied with the requirements of a DSS case plan to eliminate the reasons Ava came into DSS custody or to place himself in a position to be reunified with Ava. The trial court found that respondent-father had failed to maintain contact with DSS; timely sign and return a case plan to DSS; make an effort to reunify with Ava, except for completing a parenting class; develop a relationship with Ava; and visit Ava.

Initially, respondent-father asserts that the style of the trial court's finding of fact 11 impedes appellate review because the findings therein constitute a "stream of consciousness" rather than careful consideration of the evidence presented. *See In re*

---

[2] In an earlier order, the trial court had found respondent-father supplied Ava's mother with controlled substances during her pregnancy.

*L.L.O.*, 252 N.C. App. 447, 458–59, 799 S.E.2d 59, 66 (2017) (determining that a trial court's "stream of consciousness" style of findings "impede[d its] ability to determine whether the trial court reconciled and adjudicated all of the evidence presented to it"). We are not persuaded that the trial court's findings in finding of fact 11 amount to "stream of consciousness." Although all of the trial court's findings supporting grounds for termination under N.C.G.S. § 7B-1111(a)(2) are grouped together in finding of fact 11, the trial court did not use a personal pronoun, describe its thought process, or explain its personal experiences and feelings. The style of the trial court's finding of fact 11 does not impede appellate review.

Next, respondent-father challenges the portion of finding of fact 11 which provides that Ava "came into DSS custody partly as the result of [the mother's] substance abuse issues," rather than describing the circumstances surrounding Ava's removal as "entirely" due to the mother's substance abuse. Although the mother's substance abuse was a primary reason for the juvenile's removal from the home, the trial court also cited additional reasons in its adjudication order, including the mother's lack of prenatal care; Ava testing positive for controlled substances at birth; Ava having a low birth weight and possibly being born premature; the mother being on probation for felony possession of cocaine; the putative father being on probation for felony hit-and-run causing serious injury; the mother and putative father's inability to care for Ava; and the mother and putative father's lack of an appropriate

alternative child care arrangement. Accordingly, the trial court's use of the word "partly" was supported by clear, cogent, and convincing evidence.

Respondent-father also challenges the following portion of finding of fact 11: "a Petition was initially filed by Madison County DSS on 13 July, 2016 alleging the juvenile to be a neglected juvenile." Although Ava was ultimately adjudicated to be a dependent juvenile, the record clearly demonstrates that the 13 July 2016 juvenile petition alleged that Ava was a neglected and dependent juvenile. Thus, respondent-father's challenge is without merit.

Respondent-father next argues that no clear and convincing evidence supports the trial court's findings that he had an ongoing relationship with the mother that involved drug use and that he was aware of when Ava was born. Rather, respondent-father claims that the trial court relied solely on the mother's testimony for that finding. Here respondent-father's own testimony at the termination hearing, however, supports the trial court's finding. Respondent-father testified that he and Ava's mother had an ongoing relationship before Ava's birth that involved the use of controlled substances.

> [Attorney for DSS]: You and [Ava's mother] had a relationship with each other before this child was born. Right?
>
> [Respondent-father]: Yes, we did.
>
> . . . .

> [Attorney for DSS]: That relationship included, at some point, the use of controlled substances as well. Right?
>
> [Respondent-father]: Yes.

Accordingly, clear, cogent, and convincing evidence supports the trial court's finding that respondent-father's relationship with the mother before Ava's birth involved the use of controlled substances.

Respondent-father also disputes several of the trial court's findings regarding his case plan. First, respondent-father contests the portion of finding of fact 11 that provides that he "has not developed a DSS case plan" is not supported by clear, cogent, and convincing evidence and that his ability to comply with the case plan was "extremely limited" by his incarceration, rather than "more limited" as stated by the DSS social worker and incorporated into the findings of fact by the trial court. Even if the disputed portions of these findings are disregarded, *see In re J.M.*, 373 N.C. 352, 358, 838 S.E.2d 173, 177 (2020), respondent-father did not timely sign and return the case plan or make the necessary strides towards its completion.

A DSS social worker testified at the termination hearing that DSS sent respondent-father a case plan on 2 August 2018 and that he did not sign it until 24 September 2018. It was reasonable for the trial court to infer that waiting nearly two months to sign the DSS case plan was not "timely." Likewise, while the DSS social worker testified at the termination hearing that certain components of respondent-father's case plan were not possible to achieve in a prison setting,

respondent-father could only verify that he completed one case plan item, completing a parenting class. According to the trial court,

> [respondent-father] testified that he completed the DART substance [abuse] program in 2017 and participated in Narcotics Anonymous meetings while incarcerated; the respondent father has provided no documentation of same to the Court to confirm these services were completed and the court therefore gives little to no weight to same.

When reading finding of fact 11 and finding of fact 12 in conjunction, it is clear that the trial court acknowledged that, while respondent-father testified he completed a substance abuse program in 2017 and participated in Narcotics Anonymous meetings, he failed to provide any documentation to confirm that he completed those services. The crux of the challenged portions of both written findings 11 and 12 and the trial court's oral findings is that respondent-father failed to confirm his completion of substance abuse treatment.

Next, respondent-father argues that the remaining findings of fact do not support the trial court's conclusion that he willfully left Ava in foster care or placement outside of the home for more than twelve months without making reasonable progress to correct the conditions that led to her removal. Specifically, respondent-father argues that because the mother's substance abuse was the cause of Ava's removal, his lack of progress in the mental health, domestic violence, housing, and employment components of his case plan was not relevant in

determining whether grounds existed under N.C.G.S. § 7B-1111(a)(2) to terminate his parental rights. We disagree.

Here the findings in the adjudication order indicate that Ava was removed from the custody of the mother and the putative father on 13 July 2016 based on a myriad of reasons, including the mother's substance abuse issues; the lack of prenatal care; Ava testing positive for controlled substances at birth; and their inability to care for Ava. Ava was not removed from respondent-father's custody since he never had custody of the child. Nonetheless, at the termination hearing, the trial court orally found as fact "that the biological mother informed [respondent father] of her pregnancy back in March of 2016, approximately four months prior to the child's birth." The trial court also found that respondent-father's relationship with the mother involved the use of controlled substances, respondent-father was the mother's supplier of controlled substances, and respondent-father continued to provide her with controlled substances during her pregnancy with Ava. The trial court found in its 31 October 2018 permanency planning order that respondent-father had been incarcerated since October 2017 for possession of cocaine and possession of a firearm by a felon and had previous convictions for possession of controlled substances in 1996 or 1997 and in 2006.

A careful review of the record shows the need for the substance abuse and mental health components of respondent-father's case plan. The family services agreement provided that the objective of the mental health and substance abuse

components of respondent-father's case plan was to "identify and correct underlying traumas that cause these behaviors [in order] to create a safe and secure environment for [Ava]." Because respondent-father contributed to the problematic circumstances that led to Ava's removal, we find there is a sufficient nexus between the conditions that led to Ava's removal and the substance abuse and mental health components of respondent-father's case plan. *See In re B.O.A.*, 372 N.C. at 386–87, 831 S.E.2d at 315 (noting that the history shown in various reports and orders contained in the record reflected the existence of a sufficient nexus between the conditions that led to the child's removal and the case plan relating to the mother's mental health, substance abuse, and medication management issues).[3]

## III.

Next, respondent-father asserts that the trial court's findings are insufficient to demonstrate that it considered the obstacles to his completion of the case plan, namely the timing of when he discovered Ava was in DSS custody and his incarceration. "A parent's incarceration is a 'circumstance' that the trial court must consider in determining whether the parent has made 'reasonable progress' toward 'correcting those conditions which led to the removal of the juvenile.'" *In re C.W.*, 182

---

[3] We agree, however, with respondent-father's assertion that a nexus between the domestic violence, housing, and employment components of his case plan and the conditions that led to Ava's removal is lacking. Accordingly, respondent-father's failure to comply with those components is not relevant to the determination of whether his parental rights to Ava are subject to termination under N.C.G.S. § 7B-1111(a)(2). *See In re B.O.A.*, 372 N.C. at 385, 831 S.E.2d at 314.

N.C. App. 214, 226, 641 S.E.2d 725, 733 (2007). *But see, e.g., In re Shermer*, 156 N.C. App. 281, 290, 576 S.E.2d 403, 409 (2003) ("Because respondent was incarcerated, there was little involvement he could have beyond what he did—write letters to [his children] and inform DSS that he did not want his rights terminated.").

Respondent-father was incarcerated in part due to a conviction for felony possession of cocaine. The trial court noted in its written findings of fact that a DSS social worker acknowledged that respondent-father's ability to comply with the case plan was "more limited" while incarcerated. Even if respondent-father attempted to comply with certain aspects of the case plan, he did not supply documentation to confirm his completion of any case plan item except for a parenting class taken while incarcerated. Given respondent-father's contribution to Ava's removal from the home by supplying drugs to Ava's mother during her pregnancy and his criminal history involving controlled substances, it was imperative that he prove his successful completion of the substance abuse components of the case plan, which could be accomplished while incarcerated.

The trial court also orally found as fact that "that the biological mother informed him of her pregnancy back in March of 2016, approximately four months prior to the child's birth." Following Ava's birth, "and for the next fifteen months, respondent father did nothing to pursue his rights as the biological father of this child; there was little or no contact."

> The Court further f[ound] that at no time during or since the birth of this child has the . . . respondent contacted or tried to contact this child and to (inaudible). The respondent was here in August the child (inaudible) and acknowledged (inaudible) the Department's effort to terminate his parental rights, elected not to send cards, not to make calls. In addition, the respondent has been in this courtroom on (inaudible), during which time he never once requested the opportunity to see this child.

It is clear that respondent-father had limited communication with DSS and did not inquire as to how to communicate with Ava via cards, letters, or phone calls. He personally met and received contact information from the child's guardian *ad litem* but did not make an effort to contact him or to understand the role of the guardian *ad litem*. With regard to his efforts to complete other case plan items, the trial court found that "[a]ttempts by the father to find an appropriate (inaudible) person [as an alternative child care arrangement] failed because of his family's inability to let that happen." In finding of fact 11, the trial court found that respondent-father had "made no effort to reunify with [Ava], except the completion of a parenting class."

Ava has been in foster care since she was eleven days old. While respondent was incarcerated for over half of the time Ava was in foster care, he was not incarcerated at her birth or during the first fifteen months of her life during which she was in DSS custody. Fifteen months passed during which respondent-father knew of Ava but did not inquire about her even though he was not incarcerated. Given his minimal efforts to maintain contact with her or complete the case plan items he could during his incarceration, the trial court's findings are sufficient to demonstrate that

respondent-father's failure was willful in that he had the ability to show reasonable progress but was unwilling to make the effort. Based on the foregoing, we conclude that the trial court's findings are sufficient to support its conclusion that respondent-father left Ava in foster care for more than twelve months without making reasonable progress to correct the conditions that led to her removal. The trial court did not err by terminating respondent-father's parental rights to Ava on this ground.

## IV.

Under N.C.G.S. § 7B-1111(a)(7), a trial court may terminate the parental rights of a parent who "has willfully abandoned the juvenile for at least six consecutive months immediately preceding the filing of the petition." N.C.G.S. § 7B-1111(a)(7). "In order to find that a parent's parental rights are subject to termination based upon willful abandonment, the trial court must make findings of fact that show that the parent had a 'purposeful, deliberative and manifest willful determination to forego all parental duties and relinquish all parental claims to [the child] . . . .' " *In re A.G.D.¸* 374 N.C. 317, 319, 841 S.E.2d 238, 240 (2020) (alteration in original) (quoting *In re N.D.A.*, 373 N.C. 71, 79, 833 S.E.2d 768, 774 (2019)). "Wilful [sic] intent is an integral part of abandonment and this is a question of fact to be determined from the evidence." *Pratt v. Bishop*, 257 N.C. 486, 501, 126 S.E.2d 597, 608 (1962). "[I]f a parent withholds [that parent's] presence, [ ] love, [ ] care, the opportunity to display filial affection, and wilfully [sic] neglects to lend support and

maintenance, such parent relinquishes all parental claims and abandons the child." *Id.*

"Although a parent's options for showing affection while incarcerated are greatly limited, a parent 'will not be excused from showing interest in his child's welfare by whatever means available.' " *In re D.E.M.*, 257 N.C. App. 618, 621, 810 S.E.2d 375, 378 (2018) (emphasis omitted) (quoting *In re J.L.K.*, 165 N.C. App. 311, 318–19, 598 S.E.2d 387, 392 (2004)). "As a result, our decisions concerning the termination of the parental rights of incarcerated persons require that courts recognize the limitations for showing love, affection, and parental concern under which such individuals labor while simultaneously requiring them to do what they can to exhibit the required level of concern for their children." *In re A.G.D.*, 374 N.C. at 320, 841 S.E.2d at 240. The trial court may "consider a parent's conduct outside the six-month window in evaluating a parent's credibility and intentions" within the relevant period. *In re C.B.C.*, 373 N.C. at 22, 832 S.E.2d at 697.

Here the relevant six-month period preceding the filing of the termination petition is 31 April 2018 to 31 October 2018; respondent-father was incarcerated during this time period.

In finding of fact 12, the trial court supported its conclusion that grounds existed to terminate respondent-father's parental rights under N.C.G.S. § 7B-1111(a)(7). The trial court found in finding of fact 12 that

subsequent to the birth of the juvenile the respondent father had no contact with the juvenile; provided no care for the juvenile; provided no support for the juvenile; did not provide any care or support for the juvenile during the 14/15 months from the time the juvenile was born until he was incarcerated in October, 2017; developed no bond or relationship with the juvenile; did not contact DSS to inquire as to the status of the juvenile or develop a case plan with DSS to work to reunification with the juvenile to prevent the juvenile from remaining placed in foster care; that since paternity was established has not complied with DSS case plan requirements; did participate in the DART program while in DAC custody but has not provided documentation of same to DSS; that despite having a significant substance abuse problem over the past 20 years has only received treatment for the same while incarcerated; has presented no documentation as to completion of that program during this hearing; has recently completed a parenting course offered while incarcerated; that the respondent father has an older child with whom he has a limited relationship.

Respondent-father argues that the first part of finding of fact 12, which provides that he had not contacted or provided support or care for Ava between her birth in July 2016 and his incarceration in October 2017, is outside the relevant period. In making this argument, he relies on the assertion that there was no evidence or proper finding that he knew of Ava's existence prior to his incarceration. As previously discussed, the trial court found as fact that respondent-father knew of the child approximately four months before her birth. Therefore, we conclude that his failure to contact Ava or provide support and care for her between her birth and his incarceration was purposeful and deliberative and was properly considered by the trial court in evaluating respondent-father's credibility and intentions within the

relevant period even though the conduct fell outside the six-month window. Accordingly, the trial court's finding of fact 12 adequately supports its conclusion that respondent-father willfully abandoned Ava, and the trial court's order terminating respondent-father's parental rights under N.C.G.S. § 7B-1111(a)(7) is affirmed.

For the reasons stated above, we affirm the 26 July 2019 order of the trial court terminating respondent-father's parental rights.

AFFIRMED.

Justice EARLS dissenting.

In affirming the trial court's order terminating respondent's parental rights, the majority agrees with the trial court's conclusion that petitioners have proven by clear, cogent, and convincing evidence that respondent willfully failed to make reasonable progress towards correcting the conditions that led to Ava's removal, pursuant to N.C.G.S. § 7B-1111(a)(2), and that he willfully abandoned Ava, pursuant to N.C.G.S. § 7B-1111(a)(7). In reaching this conclusion, the majority disregards numerous recent precedents which establish that (1) a trial court must analyze the effects of a parent's incarceration on his or her capacity to comply with the terms of a court-approved DSS case plan before concluding that the parent has willfully failed to make reasonable progress within the meaning of N.C.G.S. § 7B-1111(a)(2), and (2) a trial court must consider a parent's conduct within the "determinative" six-month period preceding the filing of a termination petition when assessing whether the parent has willfully abandoned his or her child within the meaning of N.C.G.S. § 7B-1111(a)(7). Because the trial court did neither, I dissent. However, because the record contains evidence that could support the conclusion that grounds existed to terminate respondent's parental rights, I would vacate the trial court's order and remand for further factfinding.

As a preliminary matter, the evidence that respondent knew he was Ava's biological father at or near the time of her birth is equivocal. At a permanency planning hearing in September 2018, respondent testified that he did not learn about

Ava until September 2017 when he was informed of Ava's birth by her mother. At the same hearing, Ava's mother testified that, in the trial court's recounting, "respondent father was aware she was pregnant" and that she "contacted the respondent father from the hospital when the juvenile was born." In addition, DSS reported that Ava's mother "had told [respondent] he was possibly the father of [Ava] before [she] was born and repeatedly after her birth." On the basis of this testimony and the DSS report, the trial court made an oral finding of fact that "the biological mother informed [respondent] of her pregnancy in March of 2016, approximately four months prior to the child's birth. Thereafter and for the next fifteen months, respondent father did nothing to pursue his rights as the biological father of this child; there was little to no contact." In its written termination order, the trial court found that "respondent mother previously testified the respondent father was contacted shortly after the juvenile was born; that the respondent father was aware the respondent mother was pregnant; that the respondent mother and father had an ongoing relationship prior to the birth of the juvenile that involved the use of controlled substances."[1]

Notably, the trial court did not find that respondent knew Ava was *his* biological child at any time prior to September 2017, notwithstanding Ava's mother's testimony and the DSS report. There is a distinction between this finding, which the

---

[1] I reiterate my concern that a single individual's bare "testimony, supplemented by no other evidence besides the pleadings," may be insufficient to prove by clear, cogent, and convincing evidence that a ground exists to terminate parental rights. *In re L.M.M.*, 847 S.E.2d 770, 778 (N.C. 2020) (Earls, J., dissenting).

trial court did not make, and the trial court's actual finding that respondent knew of Ava's mother's pregnancy. If respondent knew that Ava was his biological child at the time of her birth, then respondent's purported lack of effort to involve himself in her life might indicate a "purposeful and deliberative" intent to wholly abandon his parental duties, as the majority states. But if respondent instead knew only that Ava's mother was pregnant and gave birth to a child, his actions (or lack thereof) would be largely, if not entirely, irrelevant. From the beginning, Ava's mother represented to DSS that her boyfriend was Ava's biological father. At a minimum, the fact that Ava's mother was publicly maintaining that her boyfriend was Ava's biological father indicates that respondent's opportunities to initiate and maintain a relationship with Ava were limited. Of course, the trial court possessed the authority to "determine which inferences shall be drawn and which shall be rejected" from conflicting or contradictory evidence. *In re Gleisner*, 141 N.C. App. 475, 480 (2000). But the trial court did not expressly draw the inference that respondent knew he was Ava's biological father prior to September 2017. Thus, the significance of respondent's conduct towards Ava in the immediate aftermath of her birth is questionable.

Nevertheless, the majority relies heavily upon respondent's failure to develop a relationship with Ava "at her birth or during the first fifteen months of her life during which she was in DSS custody." Yet even if respondent knew or reasonably should have known that he was Ava's biological parent during this time period, the trial court's order still lacks sufficient findings to support its conclusion that there is

clear, cogent, and convincing evidence that grounds existed to terminate respondent's parental rights.

First, the trial court, and the majority, both fail to adequately account for the limitations imposed by respondent's incarceration on his ability to comply with the court-approved DSS case plan. As this Court has repeatedly emphasized, "[i]ncarceration, standing alone, is neither a sword nor a shield in a termination of parental rights decision." *In re S.D.*, 374 N.C. 67, 75 (2020) (alteration in original) (quoting *In re T.N.H.*, 372 N.C. 403, 412 (2019)). It is not enough that the trial court "noted in its written findings of fact that a DSS social worker acknowledged that respondent-father's ability to comply with the case plan was 'more limited' while incarcerated." Rather, the trial court was required to independently conduct "an analysis of the relevant facts and circumstances" in order to determine "the extent to which [respondent's] incarceration . . . support[ed] a finding" that he had failed to make reasonable progress in correcting the conditions that led to Ava's removal. *In re K.N.*, 373 N.C. 274, 283 (2020).

The trial court conducted no such analysis. For example, the trial court found that "the respondent father has not developed a DSS case plan [and] has not complied with the requirements of a DSS case plan to eliminate the reasons the juvenile came into DSS custody." It is uncontroverted that respondent did indeed sign a DSS case plan on 24 September 2018. According to the majority, these facts are reconcilable because "[i]t was reasonable for the trial court to infer that waiting nearly two months

to sign the DSS case plan was not 'timely.' " Yet neither the trial court nor the majority address respondent's argument that his failure to immediately sign the case plan was caused by his inability to confer with his attorney about its terms, which resulted from his incarceration. As the trial court noted in a prior order, a writ was issued to allow respondent to attend a review hearing scheduled for 21 August 2018, but "law enforcement did not bring [respondent]." Respondent signed the case plan the next time he appeared in court with his attorney present on 24 September 2018. The trial court was not entitled to ignore the possibility that respondent's incarceration delayed his signing of the DSS case plan. *Cf. In re N.D.A.*, 373 N.C. 71, 82 (2019) (trial court must first determine "whether respondent-father had the ability to contact petitioner and [his child] while he was incarcerated" before making "a valid determination regarding the extent to which respondent-father's failure to contact [his child] and petitioner . . . was willful"). Similarly, the trial court and the majority both disregard respondent's testimony that he completed numerous courses required by his case plan while he was incarcerated because respondent failed to provide proper "documentation . . . to confirm these services were completed." Again, neither the trial court nor the majority considers the possibility that respondent's lack of documentation, or his failure to bring documentation to the termination hearing, resulted from the circumstances of his incarceration.

We have frequently held that a parent's incarceration does not excuse the parent from his or her obligation to comply with a DSS case plan to the extent his or

her circumstances allow. *See, e.g.*, *In re M.A.W.*, 370 N.C. 149, 153 (2017). But our precedents establish that a trial court must analyze the circumstances of a parent's incarceration before determining that the parent has failed to make reasonable progress pursuant to N.C.G.S. § 7B-1111(a)(2). *Cf. In re S.D.*, 374 N.C. at 77 (affirming a trial court's order that "addressed respondent-father's incarceration and the extent of his ability to satisfy the requirements of his case plan in the process of finding that his parental rights in [his child] were subject to termination"). In affirming the trial court's order without any meaningful examination of "the extent, if any, to which respondent-father's incarceration affected his ability to" comply with his DSS case plan, the majority erodes the protections afforded to all parents, including incarcerated parents, in termination proceedings. *In re N.D.A.*, 373 N.C. at 82.

Second, in attempting to justify the trial court's conclusion that respondent willfully abandoned Ava pursuant to N.C.G.S. § 7B-1111(a)(7), the majority ascribes undue weight to respondent's conduct during the time period surrounding Ava's birth. In examining whether respondent willfully abandoned Ava, the "*determinative period . . .* is the six consecutive months preceding the filing of the petition." *In re N.D.A.*, 373 N.C. at 77 (emphasis added) (citation omitted); *see also In re K.N.K.,* 374 N.C. 50, 54 (2020); *In re J.D.C.H.*, 847 S.E.2d 868, 874 (N.C. 2020); *In re A.L.S.*, 374

N.C. 515, 521 (2020); *In re C.B.C.*, 373 N.C. 16, 22 (2019).[2] Thus, "[a]lthough the trial court *may* consider a parent's conduct outside the six-month window in evaluating a parent's credibility and intentions," this conduct is less significant than conduct which occurs within the determinative period. *In re E.B.*, 847 S.E.2d 666, 672 (N.C. 2020) (emphasis added). A parent's conduct outside the determinative period is relevant only "*in evaluating a parent's credibility and intentions*"—that is, in providing context which the trial court may look to in interpreting the significance of a parent's conduct *during* the determinative period. *In re C.B.C.*, 373 N.C. at 22. A trial court's conclusion that a parent has "willfully abandoned" his or her child is necessarily unsupported by clear, cogent, and convincing evidence when the trial court fails to address relevant conduct that occurs within the determinative six-month period.

In the present case, the petition to terminate respondent's parental rights was filed on 31 October 2018, meaning the "determinative six-month period" began on 31 April 2018. It is indisputable that respondent made efforts to assert his parental rights during these six months. In May 2018, respondent took a paternity test which

---

[2] The majority does not cite to any of our numerous precedents describing the six-month period preceding the filing of the termination petition as the "determinative" period, instead referring only to a "relevant six-month period." The use of the phrase "relevant six-month period" appears intended to diminish the force of our precedents which conclusively establish that a parent's conduct during the determinative six-month period is more than "relevant" to the willful abandonment analysis under N.C.G.S. § 7B-1111(a)(7)—a parent's conduct during this window offers the most significant indicia of willful abandonment, carrying more probative value than conduct which occurs before (or after) the determinative period.

confirmed his biological parenthood. In or around June 2018, respondent provided DSS with the names of two relatives for consideration as possible kinship placements for Ava. In September 2018, respondent entered into a case-plan agreement with DSS. These actions do not "impl[y] conduct on the part of the parent which manifests a willful determination to forego *all* parental duties and relinquish *all* parental claims to the child." *In re Young*, 346 N.C. 244, 251 (1997) (emphases added). Indeed, given that respondent's "options for showing affection . . . [were] greatly limited" while he was incarcerated, respondent's efforts are flatly inconsistent with the conclusion that he willfully abandoned Ava. *In re L.M.M.*, 847 S.E.2d 770, 775 (N.C. 2020).

Even assuming *arguendo* that "respondent acted willfully and with an intention to forego his parental responsibilities" by failing to establish himself in Ava's life at the time of her birth, *In re K.N.K.*, 374 N.C. at 55, the majority's reasoning fails because it does not account for his conduct evincing an intent to assume some responsibilities of parenthood during the determinative period. In affirming an order terminating parental rights pursuant to N.C.G.S. § 7B-1111(a)(7), this Court has held that a parent's "prior efforts in seeking a relationship with [his child]" before the determinative six-month period do not "preclude a finding that he willfully abandoned [his child] pursuant to N.C.G.S. § 7B-1111(a)(7) if he did nothing to maintain or establish a relationship with [the juvenile] during the determinative six-month period." *In re C.B.C.*, 373 N.C. at 23. The converse is also true—

respondent's previous failure to establish himself in Ava's life is insufficient evidence to prove willful abandonment given that he attempted to establish a relationship with Ava during the determinative period. By failing to examine respondent's conduct during the six months preceding the filing of the termination petition, and instead relying solely on its evaluation of respondent's earlier conduct, the majority flips the willful abandonment inquiry on its head. This approach is irreconcilable with settled precedents which we have recently and repeatedly reaffirmed.

For the above-stated reasons, I respectfully dissent.